## S99A0593. THE STATE v. HENDERSON.
### (517 SE2d 61)

HUNSTEIN, Justice.

William James Henderson is a pre-trial detainee in the Carroll County Jail who has been charged with murdering his ex-wife's two children and other crimes. The State has announced its intention to seek the death penalty. This appeal arises out of a motion to suppress Henderson filed in regard to writings he made which were seized by law enforcement officers after a search of Henderson's jail cell. Henderson claimed that the search of his cell, which was conducted pursuant to a search warrant obtained by a GBI agent investigating the charged crimes and was instigated to uncover evidence to support the case against Henderson, violated Henderson's rights under the U. S. and Georgia Constitutions as well as statutory law. OCGA § 17-5-1 et seq. At the close of evidence at the hearing on the motion to suppress, the trial court stated that it was granting Henderson's motion to suppress on two bases: (1) on the legal basis that Henderson, as a prisoner, "had the same right of privacy as any other citizen," and (2) on the factual basis that the information used to support the search warrant, which was provided by a jailhouse informant, lacked any indicia of reliability. The State has appealed. OCGA § 5-7-1 (a) (4); see also *State v. Ritter*, 268 Ga. 108, fn. 1 (485 SE2d 492) (1997). We reverse both bases for the trial court's ruling.

1. The trial court erred by concluding that Henderson's arrest and incarceration had no impact on his Fourth Amendment privacy and possessory interests in his personal effects.[1] In *Hudson v. Palmer*, 468 U. S. 517 (104 SC 3194, 82 LE2d 393) (1984), a convicted inmate filed an action against a prison official pursuant to 42 USC § 1983 claiming his Fourth Amendment rights had been violated by an unreasonable "shake down" search of his prison locker and cell. The *Hudson* Court reiterated the long-standing rule that prisoners retain those rights that are not "fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Id., 468 U. S. at 523 (II) (A). However, as to a prisoner's expectation of privacy, the *Hudson* Court held that

> society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply

---

[1] The Sixth Amendment provides a separate basis precluding the seizure of privileged documents between an attorney and an incarcerated client. See also OCGA § 17-5-21 (a) (5). That issue is not present in this case, however, because the trial court did not base its ruling on any Sixth Amendment concerns.

> within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

Id. at 526. In so holding, the Court identified several prison objectives, such as ensuring the safety of prison staffs, administrative personnel, visitors and inmates; the exclusion of drugs and contraband from prison premises; the detection of escape plots; and the maintenance of a sanitary environment. Id. at 526-527. The Court recognized that it "would be literally impossible to accomplish the prison objectives identified above if inmates retained a right of privacy in their cells. . . . Unfettered access to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained." Id. at 527.

Because "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order," (footnote omitted), id. at 527-528, the *Hudson* Court concluded that "prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." Id. at 530. We hold that the ruling in *Hudson* regarding the inapplicability of the Fourth Amendment to searches of convicted prisoners' cells reflects the proper interpretation of Art. I, Sec. I, Par. XIII of the Georgia Constitution as to such searches. To the extent the trial court's order is contrary to this holding, it is reversed.

2. Although the trial court referred to Henderson simply as a "prisoner," a distinction exists between pre-trial detainees (such as Henderson) and prisoners who are incarcerated because they have been convicted of crimes. The United States Supreme Court in *Hudson* addressed only the Fourth Amendment rights of convicted inmates and did not state that its holding applied to pre-trial detainees. The Court did reference with approval its earlier decision in *Bell v. Wolfish*, 441 U. S. 520 (99 SC 1861, 60 LE2d 447) (1979), in which it did not hold but only assumed, arguendo, that pre-trial detainees retained some expectation of privacy, albeit an expectation that was substantially diminished due to the responsibility of prison officials to manage detention facilities to ensure security and order. *Hudson* was rendered the same day as *Block v. Rutherford*, 468 U. S. 576 (104 SC 3227, 82 LE2d 438) (1984), in which the Court held that *Bell v. Wolfish*, supra, governed the resolution of that case, a class action filed by Los Angeles County pre-trial detainees challenging, inter alia, irregular shakedown searches of individual cells. The *Block* Court upheld the irregular searches, citing the deference to be

accorded jail officials in " 'mak[ing] the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees.' " (Footnote omitted.) Id., 468 U. S. at 591.

Reading *Hudson, Bell,* and *Block* together, we conclude that the United States Supreme Court in *Hudson* did not deprive pre-trial detainees of all Fourth Amendment protections. Accord *United States v. Cohen,* 796 F2d 20, 24 (2nd Cir. 1986); *United States v. Reece,* 797 FSupp. 843, 846 (D.Colo. 1992); *McCoy v. State,* 639 S2d 163, 165 (Fla.App. 1 Dist. 1994). This holding is consistent with Georgia case law. See *Thomas v. State,* 263 Ga. 85, 87 (428 SE2d 564) (1993), in which this Court stated that "[a]ny expectation of privacy a pretrial detainee may have in her cell is *necessarily diminished.* [Cit.]" (Emphasis supplied.)

3. The State urges that *Thomas v. State,* supra, controls the constitutional issue regarding the search of Henderson's cell. *Thomas* involved letters written by Thomas, a pre-trial detainee, to her co-defendant, who was incarcerated in the same facility. Jail officials intercepted the letters Thomas left under the jail barber's chair[2] and also seized letters from Thomas' cell. We upheld the validity of the seizure, stating that "[f]or security and maintenance purposes, jail officials must have access to the cells and personal effects of all prisoners (including pretrial detainees)." Id.[3] See also *Thurman v. Kentucky,* 975 SW2d 888, 899 (V) (Ky. 1998) ("letters voluntarily written by an inmate, without threat or coercion, which are intercepted by prison guards pursuant to established practice designed to protect the facility and promote security, may be provided to prosecutors for use at trial" without violating Fourth Amendment proscription against unreasonable searches and seizures).

*Thomas* thus stands for the proposition that the Fourth Amendment does not apply to a search by jail officials of a pre-trial detainee's cell for security and maintenance purposes. However, this State and foreign jurisdictions have recognized a distinction when the search of a pre-trial detainee's cell is not initiated by jail officials for legitimate prison objectives, but rather is instigated by prosecution officials "solely to bolster the prosecution's case against a pretrial detainee awaiting his day in court." *United States v. Cohen,* supra, 796 F2d at 23. See *Lowe v. State,* 203 Ga. App. 277 (1) (416

---

[2] The Court held that Thomas had no expectation of privacy in the barber chair letters because they had been exposed to the public. Id. at 87.

[3] Federal courts have recognized that Fourth Amendment protection does not extend to searches by jail officials to prevent the passing of private notes in violation of prison regulations limiting communications between prisoners. See *United States v. Dawson,* 516 F2d 796 (II) (9th Cir. 1975).

SE2d 750) (1992). See also *McCoy v. State*, supra, 639 S2d at 166; *People v. Hardy*, 825 P2d 781 (16) (Cal. 1992). Accord 4 LaFave, *Search and Seizure* § 10.9 (a) (3rd ed. 1996). As the Second Circuit Court of Appeals stated in *Cohen*, supra,

> The emphasis on the need to accommodate individual rights to what is recognized as legitimate penological objectives is the dominant theme throughout the [United States] Supreme Court's writing on this subject. . . . It is the scope of these rights that is necessarily limited by the broad authority prison officials must have to ensure institutional security; obviously the creation of a limitation or condition on the exercise of constitutional rights is essential to orderly prison administration. Yet, because conditioning the exercise of such rights rests on the twin-rationale of *objective* administrators insuring prison *security*, a limitation imposed on prisoners' constitutional rights cannot stand when the objectives the rationale serves are absent.

Id., 796 F2d at 23-24.[4] The Court of Appeals of Georgia has concluded that the rationale of *Hudson* does not "deprive the defendant of all Fourth Amendment protection where no institutional need is served by the search. [Cits.]" *Lowe v. State*, supra, 203 Ga. App. 278-279 (1). Accord *Cohen*, supra. See also *McCoy*, supra, 639 S2d at 166, holding that the *Hudson* Court "did not intend its holding to extend to searches such as that conducted in this case, which are not initiated by institutional personnel and are not even colorably motivated by concerns about institutional security."

Georgia law and persuasive foreign authority thus support our holding that where the search of a pre-trial detainee's cell is instigated or conducted by representatives of the prosecution solely for the purpose of uncovering incriminating evidence which could be used against the detainee at trial, rather than out of concern for any of the legitimate prison objectives identified by the *Hudson* Court, 468 U. S. at 526-527, the pre-trial detainee retains a limited but legitimate expectation of privacy that he would be protected in such circumstances from an unreasonable search under the Fourth Amendment. *Lowe*, supra; see also *Cohen, McCoy*, supra. Compare *United States v. Jeffus*, 22 F3d 554 (IV) (4th Cir. 1994).[5] *Thomas v. State*,

---

[4] The United States Supreme Court denied certiorari in *Cohen*. 479 U. S. 854 (107 SC 189, 93 LE2d 122) (1986) and 479 U. S. 1055 (107 SC 932, 93 LE2d 982) (1987).

[5] In *United States v. Jeffus*, supra, the Fourth Circuit Court of Appeals refused to consider the validity of the search warrant used to seize personal papers from a pre-trial detainee's cell, relying solely on *Hudson v. Palmer*, supra, 468 U. S. at 526-527. The opinion

supra, 263 Ga. at 87 (3), is thus distinguishable since the search challenged there was conducted by jail officials for security and maintenance purposes. Here, the evidence adduced in the case at bar establishes uncontrovertedly that the sole purpose of the search of Henderson's cell was to further the prosecution's effort to obtain a conviction against Henderson. Accordingly, we reject the State's position that a valid search warrant was not required before searching Henderson's cell so as to render irrelevant the question of the validity of the warrant obtained in this case. *Lowe,* supra.

4. Turning now to the validity of that warrant, we reverse the trial court's ruling that there was no probable cause to support its issuance.

The affidavit by GBI Special Agent Larry Duren set forth that Henderson is incarcerated in a cell in the Carroll County Jail along with other inmates, including Donald Lashley. Lashley informed Agent Duren that Henderson approached Lashley, crying, and unburdened himself about the crimes; Henderson then asked Lashley to assist him in writing a book about Henderson's life with the murder victims' mother. Lashley related details about the crimes, including minor details regarding the vehicle Henderson drove to the crime scene (a van), where he parked the van, how he non-violently gained entrance into the home, the type and caliber of weapon he used, the fact that Henderson had originally given the murder weapon to one of the victims, and Henderson's action in showering at the murder scene. These details were all corroborated by evidence uncovered by the police investigation of the crime. Lashley also showed Duren a notepad which Lashley represented as containing material for the book he was helping Henderson to write about the murders. Lashley stated that he had become upset over the murder of the children and wanted the investigators to know the details Henderson had provided him. The affidavit also averred that Lashley had agreed to wear a hidden tape recorder so that he could serve as a "listening post" for the officers to confirm the book plan. The search warrant issued sought all writings and tapes at Henderson's cell bunk that might supply the agents with evidence pertaining to the deaths of the two children.

The evidence adduced at the hearing on Henderson's motion to suppress established that Henderson was incarcerated in a "bullpen" area along with several other inmates, including Lashley, who was in jail for having left the state without authority while on probation for a forgery conviction. Lashley voluntarily provided the information to

does not indicate who instigated the search and does not make any reference to *Cohen,* supra.

the police: he was not asked to obtain it or paid for his action and he neither sought nor obtained favorable treatment as a result of the information he volunteered. Agent Duren testified he could not approach other inmates in the cell to verify Lashley's information because of concerns for Lashley's personal safety. On two separate occasions Lashley voluntarily wore a "body bug" listening device but due to the acoustics in the bullpen the police were unable to rebut or verify Lashley's information by this means. Agent Duren testified that he believed several of the crime details Lashley provided him had not been publicly disseminated; further, based on Lashley's recent return from out of state and his incarceration, the agent believed that Lashley had not had the opportunity to learn these details from any source other than Henderson. The agent found the notepad where Lashley told him it would be, namely, under Henderson's mattress. While the affidavit failed to suggest that Henderson's papers would be seized in order to provide a handwriting sample, compare *Lowe v. State*, supra, 203 Ga. App. 279, the evidence at the hearing established that experts were able to determine that the handwriting on some of the papers was Henderson's. Lashley also testified, identifying the pages in the notepad which had been written by Henderson.

> A search warrant will only issue upon facts sufficient to show probable cause that a crime is being committed or has been committed. OCGA § 17-5-21 (a). The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. [Cit.] Our duty in reviewing the magistrate's decision in this case is to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrants. [Cit.] A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court. [Cit.]

(Punctuation omitted.) *DeYoung v. State*, 268 Ga. 780, 786-787 (7) (493 SE2d 157) (1997). See also *Gary v. State*, 262 Ga. 573, 577 (422 SE2d 426) (1992).

> "[A] grudging or negative attitude by reviewing courts toward warrants, is inconsistent both with the desire to

encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case. A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. . . . Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." . . . [Cits.]

*State v. Davis*, 217 Ga. App. 225, 227 (457 SE2d 194) (1995), aff'd *Davis v. State*, 266 Ga. 212 (465 SE2d 438) (1996).

Applying this standard of review, we find that the information presented to support the search warrant in this case provided a substantial basis for concluding that probable cause existed that evidence pertaining to the murders of the two children was located at Henderson's bunk in his cell at Carroll County Jail. The fact that the information on which the affidavit was based was volunteered by a prisoner in the jail does not automatically render the information lacking any indicia of reliability. See *Ivory v. State*, 160 Ga. App. 193 (286 SE2d 435) (1981) (inmate who volunteered information was not unidentified, paid informant whose previous reliability required averment in affidavit).

Therefore, because the State properly sought and obtained a search warrant before it seized the written materials from Henderson's cell, compare *Cohen, McCoy,* supra, and the warrant validly authorized the State to seize those materials, we reverse the trial court's grant of Henderson's motion to suppress. See generally *State v. Law*, 208 Ga. App. 744 (432 SE2d 110) (1993). Compare *Lowe v. State,* supra, 203 Ga. App. at 278 (1).

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 1, 1999 —
RECONSIDERATION DENIED JULY 6, 1999.

*Peter J. Skandalakis, District Attorney, Jeffery W. Hunt, Assistant District Attorney,* for appellant.

*Thomason & Blackmon, Dennis T. Blackmon, Word & Simmons, Maryellen Simmons,* for appellee.